# United States Court of Appeals
## For the First Circuit

No. 14-1414

AARON SARNACKI,
derivatively on behalf of Smith & Wesson Holding Corporation,

Plaintiff, Appellant,

v.

MICHAEL F. GOLDEN; JOHN A. KELLY; BARRY M. MONHEIT; KENNETH W. CHANDLER; JOHN B. FURMAN; I. MARIE WADECKI; JEFFREY D. BUCHANAN; ROBERT L. SCOTT; MITCHELL A. SALTZ; COLTON R. MELBY; ANN B. MAKKIYA; LELAND A. NICHOLS; THOMAS L. TAYLOR; SMITH & WESSON HOLDING CORPORATION,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Kayatta, Circuit Judges.

Julia M. Williams, with whom Craig W. Smith, Robbins Arroyo LLP, Terence K. Ankner, and Partridge, Ankner & Horstmann, LLP were on brief, for appellant.
John A. Sten, with whom Jason C. Moreau, Victoria E. Thavaseelan, and McDermott Will & Emery LLP were on brief, for appellees.

February 4, 2015

**LYNCH, Chief Judge**. This is a shareholder derivative suit under state law which, after investigation by a Special Litigation Committee, the corporation rejected. It is one of several suits alleging that Smith & Wesson Holding Corporation ("Smith & Wesson") made misleading public statements in 2007 about demand for its products. We previously affirmed a grant of summary judgment for the corporation in a class action alleging that these statements constituted violations of federal securities laws. In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68 (1st Cir. 2012).

In this case, Aaron Sarnacki asserts Nevada state-law claims against Smith & Wesson's officers and directors, including breach of fiduciary duties, waste of corporate assets, and unjust enrichment. In reaction to earlier and parallel cases, in June 2009, Smith & Wesson's Board formed a Special Litigation Committee (SLC) to investigate and determine the viability of any of these claims and to make a recommendation to the Board whether to pursue any of these claims. The SLC recommended against filing any claims. On the basis of that decision, the defendants here moved for summary dismissal under Delaware law, as adopted by Nevada. After limited discovery, the district court granted the motion. We affirm.

-2-

I.

Smith & Wesson is a major gun manufacturer incorporated in Nevada with its principal place of business in Springfield, Massachusetts. The defendants are or were officers or directors of Smith & Wesson, including both its CEO and former CFO. Sarnacki is a shareholder of Smith & Wesson who is a citizen of Maine.

Sarnacki's suit alleged that, starting in the second quarter of 2007, the defendants made or caused the company to make a series of public statements, including press releases, touting high sales projections due to the company's new rifle and shotgun business. For example, on September 6, 2007, the company issued a press release raising sales projections for fiscal year 2008[1] based on "growth in [their] core handgun business as well as [their] newly established long gun business."[2] Through September 10, 2007, the company continued to predict strong sales growth and raised earnings guidance in press releases, on conferences calls, and in federal filings.

Sarnacki alleged that all this time, Smith & Wesson and the defendants had evidence that these projections were false. Smith & Wesson had overinvested in production while demand

---

[1] Smith & Wesson's fiscal year begins on May 1, so FY 2008 began May 1, 2007. See In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d at 70 n.2.

[2] The higher earnings projections were based in part on Smith & Wesson's entrance into the market for long guns, complementing their core business selling handguns.

collapsed at the start of the economic downturn, leading to excessive inventory.  Although aware of this, the defendants continued to tout high projected sales, and some of the defendants sold millions of their shares.

The defendants finally corrected their alleged misrepresentations. On October 29, 2007, the company reduced its net income guidance by ten cents per diluted share, causing a 40% drop in share price.  In that new guidance, the defendants pointed in part to soft demand for long guns and excessive inventory.  On December 6, 2007, the company again reduced guidance by thirteen cents per diluted share, and on January 22, 2008, the company withdrew their earnings guidance completely.  In total, the company lost $726 million in market capitalization.

As is often the case in these situations, a number of securities fraud cases were brought against the company.  In December 2007 and January 2008, three putative class actions were filed in federal district court in Springfield against the company and three individuals, alleging violations of federal securities laws.  See In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 334-35 (D. Mass. 2009).  Those actions were consolidated into one case, the "Securities Class Action." Id. at 334 n.1. The district court eventually granted summary judgment to the defendants on March 25, 2011, finding that there was insufficient evidence of scienter and that the company's statements

were neither false nor misleading.  In re Smith & Wesson Holding Corp. Sec. Litig., 836 F. Supp. 2d 1, 3 (D. Mass. 2011).  This court affirmed.  In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d at 77.

On February 1, 2008, Sarnacki filed a shareholder derivative suit in Massachusetts state court.  That case was consolidated with other similar cases and dismissed in January 2009 because the plaintiffs failed to make a proper pre-suit demand on the Board of Directors.  See Sarnacki ex rel. Smith & Wesson Holding Corp. v. Golden, 4 F. Supp. 3d 317, 320-21 (D. Mass. 2014) (explaining procedural history and previous litigation).

Having received two other demand letters, Smith & Wesson formed a Special Litigation Committee on June 22, 2009, to evaluate the viability of claims in the demand letters.  See In re Smith & Wesson Holding Corp. Derivative Litig., 743 F. Supp. 2d. 14, 17 (D. Mass. 2010).  The SLC consisted of three directors: John Furman, Robert Scott, and I. Marie Wadecki.  Two of those directors, Furman and Wadecki, were also outside directors and members of the Audit Committee during the relevant times.  The SLC hired an independent law firm, then known as Fierst, Pucci & Kane LLP of Northampton, Massachusetts, and conducted the investigation at issue in this case.

On September 4, 2009, Sarnacki sent a demand to Smith & Wesson's Board, insisting that it commence an independent

investigation and recover damages caused by the officers' and directors' breaches of fiduciary duties. Corporate counsel for the Board responded to Sarnacki, notifying him of the SLC and demanding information proving Sarnacki's ownership of shares during the relevant times. The SLC's counsel also contacted Sarnacki, requesting similar information.

On October 28, 2010, Sarnacki filed this diversity action in federal district court in Arizona.[3] The claims arise under Nevada state law for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and entitlement to contribution or indemnification. Sarnacki, 4 F. Supp. 3d at 321.

The SLC issued its report on December 23, 2010, concluding that "there is insufficient evidence of any breach of fiduciary duty by the named officers and directors" and that it is "not . . . in the best interests of the Company" to pursue a derivative suit. On January 13, 2011, this case was transferred to the District of Massachusetts with the consent of both parties. On July 1, 2011, the defendants filed a motion to dismiss, based on the SLC's final report. The district court denied the motion without prejudice on March 29, 2012, and ordered limited discovery on the adequacy of the SLC's investigation. Sarnacki v. Golden,

---

[3] Sarnacki insists that he filed on this date to ensure a shareholder suit satisfied the pertinent statute of limitations, though the SLC (allegedly unbeknownst to Sarnacki) obtained tolling agreements.

No. 11-cv-30009-MAP, 2012 WL 1085539, at *2 (D. Mass. Mar. 29, 2012).

After discovery, the defendants moved for summary dismissal on June 28, 2013, again on the basis of the SLC's conclusions.  Under Delaware law, a motion to terminate a derivative suit because an SLC has recommended against filing any claims is handled by summary dismissal, a "hybrid summary judgment motion for dismissal."  Zapata Corp. v. Maldonado, 430 A.2d 779, 787 (Del. 1981).  The district court granted that motion on March 12, 2014.  Sarnacki, 4 F. Supp. 3d at 327.  This appeal followed.


II.

The parties agree that Delaware law, by operation of Nevada law, applies to this case.  Sarnacki, 4 F. Supp. 3d at 322; Sarnacki, 2012 WL 1085539, at *2; see Moradi v. Adelson, No. 2:11-cv-00490-MMD-RJJ, 2012 WL 3687576, at *2 n.1 (D. Nev. Aug. 27, 2012); In re Amerco Derivative Litig., 252 P.3d 681, 697 (Nev. 2011).  Under Delaware law, if the corporation moves for summary dismissal of a shareholder suit on the basis of the SLC's judgment, a court conducts a two-step inquiry.  First, the corporation must prove the SLC's (1) independence, and (2) good faith and reasonable bases for its conclusions.[4]  Zapata, 430 A.2d at 788-89.  On these

_____

[4] We analyze the SLC's good faith and reasonableness together, though Delaware's courts sometimes analyze them separately. Compare Kahn v. Kolberg Kravis Roberts & Co., 23 A.3d 831, 841-42

questions, the burden is on the corporation to show "that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law." Id. at 788. Second, in the court's discretion, the court may apply "its own independent business judgment" to "thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit." Id. at 789. The district court here decided the case at the first step, and Sarnacki does not argue that it should have conducted the step-two inquiry.

This court has never addressed the standard of review for a summary dismissal at Zapata step one. We now hold that the applicable standard of review is de novo, because a summary dismissal under Delaware law is a hybrid of a motion to dismiss and a motion for summary judgment, both of which we review de novo. See Booth Family Trust v. Jeffries, 640 F.3d 134, 139-41 (6th Cir. 2011). Although the standard of review is a matter of federal law, see Booth, 640 F.3d at 140 ("[C]onsistent with the Erie doctrine, federal law governs the standard of review of a summary judgment motion in a diversity case."), our holding is consistent with Delaware state law, see Kahn v. Kolberg Kravis Roberts & Co., 23 A.3d 831, 840-41 (Del. 2011) ("Zapata's first prong is subject to a summary judgment standard, our review of which is de novo.").

---

(Del. 2011) (together), with Kindt v. Lund, No. Civ. A. 17751-NC, 2003 WL 21453879, at *3-4 (Del. Ch. May 30, 2003) (separately).

Accordingly, we consider de novo whether the district court erred in finding as a matter of law that (a) the SLC was independent, and (b) the SLC's investigation was reasonable and conducted in good faith.

A. Independence

The independence inquiry is highly fact specific and centers on whether any member of the SLC, "for any substantial reason, [is] incapable of making a decision with only the best interests of the corporation in mind." In re Oracle Corp. Derivative Litig., 824 A.2d 917, 938 (Del. Ch. 2003) (citation and quotation marks omitted).

Sarnacki's main challenge to the SLC's independence is that two of the three SLC members, Wadecki and Furman, could not be independent for two reasons. The first is that they are defendants in this case. The second reason is that, as members of the Audit Committee, they reviewed and approved many of the allegedly misleading statements. In particular, Sarnacki's complaint alleged that the Audit Committtee approved financial statements, press releases, and "financial information and earnings guidance provided to analysts and rating agencies," though the record does not show that they approved scripts for earnings conference calls.

There are no per se rules holding that an SLC's independence is destroyed by either naming a member as a defendant or a members' past approval of a disputed statement. See Kaplan v.

<u>Wyatt</u>, 499 A.2d 1184, 1189 (Del. 1985) ("Even a director's approval of the transaction in question does not establish a lack of independence."); <u>Kindt</u> v. <u>Lund</u>, No. Civ. A. 17751-NC, 2003 WL 21453879, at *3 (Del. Ch. May 30, 2003) ("The fact that Senator Garn was on the board and approved the transactions does not negate his independence. Nor does his being named as a defendant cause Senator Garn to lack independence." (footnotes omitted)). Rather, the inquiry is more closely based on the facts. Sarnacki must "show more" to suggest that an SLC member's "position as a member of the Board of Directors influenced his decisions as a member of the [SLC]." <u>Kaplan</u>, 499 A.2d at 1189.

There are good reasons to reject such per se rules. If an SLC member's status as a defendant in the litigation categorically subverted the independence of the committee, a shareholder would be able to manipulate the process: he or she would be able to name SLC members as defendants after the committee's formation, thereby undercutting the legitimacy of its conclusions. <u>See</u> <u>Lewis</u> v. <u>Graves</u>, 701 F.2d 245, 249 (2d Cir. 1983) (calling, in the context of the demand requirement, such a move a "transparent litigation tactic"). The realities of corporate governance, in which some corporations have small boards, suggest that an SLC will frequently include at least one director who also approved the relevant transaction. <u>Cf.</u> <u>id.</u> at 248 ("By virtue of

their offices, directors ordinarily participate in the decision making involved in such transactions.").

These realities of corporate governance play a role here. The SLC was formed on June 22, 2009. At that time, Smith & Wesson had an eight-person Board including a three-person Audit Committee. Though the three SLC members were named as alleged wrongdoers along with the rest of the Board, neither the Securities Class Action nor the other demand letters specified any wrongdoing by the Audit Committee. In creating a three-person SLC, then, the Board could reasonably have selected members of the Audit Committee without any attempt to undermine the SLC's independence, screening only for expertise and ensuring that the SLC had at least two outside directors. It was only months after the SLC's formation that Sarnacki sent his demand, on September 4, 2009, to the Board specifying misconduct by the Audit Committee. By that point, the SLC had met, hired counsel, and begun communicating with plaintiffs in other derivative actions. It was not unreasonable for the Board to decline to abandon the SLC, which had already started its work, and to reconstitute a new one.

To say there is no per se rule does not mean that there is no cause for concern. Those who are asked to evaluate conduct which they have approved may have a tendency not to find fault. But the Delaware Supreme Court has held that "a director is independent when he is in a position to base his decision on the

merits of the issue rather than being governed by extraneous considerations or influences." <u>Kaplan</u>, 499 A.2d at 1189; <u>see also, e.g.</u>, <u>Sutherland</u> v. <u>Sutherland</u>, No. C.A. 2399-VCL, 2008 WL 1932374, at *3 (Del. Ch. May 5, 2008). Sarnacki offers no evidence of actual bias affecting any decisionmaker or of extraneous considerations having motivated either the process or the ultimate recommendation. Moreover, the Committee did not use in-house counsel, a disapproved practice, but chose independent counsel.

Sarnacki overstates the record when he argues there were admissions of non-independence. He argues that the SLC members admitted prejudging the merits of the claims they were charged with investigating. But in the statements at issue, the SLC members testified merely that they were doubtful of Sarnacki's derivative claims based on their background knowledge and the Board's preliminary investigations before the SLC was formed. They did not draw any formal conclusions, and that they had some preliminary views is not surprising and does not by itself constitute prejudgment of the issue. In the case cited by Sarnacki, in contrast to the record here, the SLC members "conducted the investigation with the object of putting together a report that demonstrates the suit has no merit." <u>London</u> v. <u>Tyrrell</u>, No. 3321-CC, 2010 WL 877528, at *15 (Del. Ch. Mar. 11, 2010).

Sarnacki also argues the district court erred by considering each of his bias arguments separately, rather than as

a totality. Sarnacki complains that had the district court viewed the structural bias, the evidence of prejudgment, and arguments on the good faith and reasonableness prong together, it would have seen a lack of independence by the SLC. We do not read the decision that way and on de novo review, considering these all together, conclude there is no merit.

Sarnacki finally argues that, even if he has not plausibly challenged the SLC's independence, that is not his burden. Rather, the defendants must prove the SLC's independence. Sarnacki is right on the law. See Zapata, 430 A.2d at 788. But the defendants have carried their burden. Smith & Wesson's Board appointed three experienced directors, two of whom were outside directors on the independent Audit Committee, to the SLC. They were "in a position to base [their] decision on the merits of the issue rather than being governed by extraneous considerations or influences." Kaplan 499 A. 2d at 1189. And Sarnacki has offered no plausible argument to the contrary.

We do not rely, as did the district court, on a theory that Sarnacki "tacitly conceded the independence of the SLC by making a demand on the board." Sarnacki, 4 F. Supp. 3d at 325. As Sarnacki correctly observes, the court's analysis is incorrect. The cases discussing this tacit concession focus on the effect of the concession implicit in a demand on a plaintiff's later attempt to argue that making a demand was excused. See, e.g., Spiegel v.

-13-

<u>Buntrock</u>, 571 A.2d 767, 775-77 (Del. 1990). Delaware's cases do not say that such a concession limits later arguments about an SLC's independence. To the contrary, they say that a plaintiff can make a demand and subsequently argue that the Board improperly refused the demand, including by challenging the SLC's independence. <u>See, e.g.</u>, <u>Grimes</u> v. <u>Donald</u>, 673 A.2d 1207, 1219-20 (Del. 1996), <u>overruled on other grounds by</u> <u>Brehm</u> v. <u>Eisner</u>, 746 A.2d 244, 253 & n.13 (Del. 2000).

On the undisputed facts, the Board has met its burden as to the independence of the SLC.

B.  <u>Good Faith and Reasonableness</u>

The good faith and reasonableness inquiry focuses on the process used by the SLC, rather than the substantive outcome of the process. <u>See</u> <u>Spiegel</u>, 571 A.2d at 778 ("The ultimate conclusion of the [special litigation] committee . . . is <u>not</u> subject to judicial review." (alterations in original)(quoting <u>Zapata</u>, 430 A.2d at 787) (internal quotation marks omitted)). Courts look to indicia of the SLC's investigatory thoroughness, such as what documents were reviewed and which witnesses interviewed. <u>See</u> <u>Sarnacki</u>, 4 F. Supp. 3d at 325.

There is no question that the SLC relied on experienced independent counsel, reviewed relevant discovery materials, and released a lengthy final report, all indicia of a reasonable process and good faith.

Sarnacki first argues that the SLC abdicated its responsibilities, placing the entire investigation in its counsel's hands. This is in some tension with his suggestion that the SLC members could have been out to protect themselves. Second, he argues that the SLC's work was tainted, because SLC independent counsel collaborated closely with counsel representing the defendants in the Securities Class Action.

Sarnacki again overstates the record. He takes statements from the SLC members' depositions that they were generally unaware of the scope of discovery to show that they were so uninvolved as to abdicate their roles to independent counsel. For example, SLC counsel obtained an extensive document production from the Securities Class Action defendants' counsel, but SLC members could not testify as to the details of how that production was generated or how documents from that production were selected for their personal review.

Reliance on experienced outside counsel for the SLC is often taken as evidence that the SLC conducted its investigation reasonably and in good faith, not the opposite. See, e.g., Grafman v. Century Broad. Corp., 762 F. Supp. 215, 220 (N.D. Ill. 1991). There is no adverse inference to be drawn about the members delegating the discovery methodology or filtering decisions to counsel. The SLC members did personally review the relevant documents and make the final decisions about the contents of the

SLC report.[5]  The plaintiffs cite no case for the proposition that relying on counsel for discovery decisions, without more, is unreasonable or a sign of bad faith.  Cf. Peller v. The Southern Co., 707 F. Supp. 525, 529 (N.D. Ga. 1988) (explaining that while an SLC's "reliance on counsel is an accepted practice," insulating the investigation from scrutiny by privileging the SLC's documents is "not good faith"); Davidowitz v. Edelman, 583 N.Y.S.2d 340, 344 (N.Y. Sup. Ct. 1992) (finding an SLC's investigation unreasonable because "[t]he committee did not join in their counsel's investigation or review, save in the most perfunctory manner").  The errors in those cases did not happen here.

Sarnacki argues that SLC counsel engaged in "heavy reliance" on discovery by the defendants' counsel in the federal Securities Class Action, and this should have been a "red-flag warning" to the SLC that they needed to supervise SLC counsel more closely.  Since they failed to do so, the argument goes, the SLC effectively relied on conflicted counsel.

This argument contains a fatal flaw: there is no evidence that SLC counsel was biased or conflicted, and the SLC's choice to

_____

[5] The defendants rely heavily on the SLC's final report to rebut Sarnacki's claims.  Sarnacki rejects this by observing that the report was authored by SLC counsel, and so cannot show that the SLC members themselves were adequately involved in the process.  We are doubtful that the claimed inconsistencies between the final SLC report and the SLC members' deposition testimony undermine the report in any serious way.  Nonetheless, we do not place heavy emphasis on that report in reaching our conclusion.

save costs and avoid duplication in discovery by using what had already been produced in the securities action was eminently sensible. Cf. Kindt, 2003 WL 21453879, at *4 (finding an SLC's conclusion reasonably supported even as the SLC saved costs by foregoing a formal fairness opinion of a merger). The discovery from the class action case was plainly relevant to the SLC's decision. The cases Sarnacki cites, which involved a conflict by the SLC's own counsel, have no bearing here. E.g., Stepak v. Addison, 20 F.3d 398, 406-08 (11th Cir. 1994).[6]

Having dealt with Sarnacki's second argument, we point out that the differences between Sarnacki's claims and those of the class action did not render use of that discovery unreasonable or in bad faith.

Sarnacki next places heavy emphasis on the SLC's reliance on two experts who were also used by the defendants in the

---

[6] Sarnacki also emphasizes that the SLC members, in their depositions, could not recall basic information about their task. For example, Sarnacki emphasizes that the SLC members did not remember the contents of Sarnacki's demand letter. Their lack of memory, he argues, supports the view that the SLC members were so uninvolved in the investigation that they abdicated their responsibilities.

This argument is unsupported by the record. See Sarnacki, 4 F. Supp. 3d at 326. While the SLC members failed to recall answers to many questions asked, substantial time passed between their depositions in this case (in March and April 2013) and the SLC's final report (in December 2010). Some details unknown to the SLC members pertained to the discovery process, which the SLC delegated to counsel. Finally, as Sarnacki explains in other parts of his brief, the SLC members' answers of "Not that I recall" often meant "No we did not," rather than "I do not remember."

-17-

Securities Class Action. The SLC retained Dr. Craig Moore, an economic expert, to analyze financial data. The SLC also retained the DiNatale Detective Agency to investigate allegations made by unnamed former employees. As to Dr. Moore, the defendants note that the SLC was aware of his potential conflict, reviewed the deposition transcript from the class action in which Dr. Moore was cross-examined, and reviewed deposition transcripts of the plaintiffs' experts from the class action. The SLC was perfectly capable of evaluating the soundness of Dr. Moore's opinion in light of his potential conflict.

As to DiNatale, the defendants argue that the agency only provided "written reports of factual interviews," to which Sarnacki replies that those reports were not passed along to the SLC members. If the DiNatale agency did not produce any information actually used in the SLC's decision, it could not have caused the SLC members to act in bad faith or unreasonably. The SLC's use of the defendants' experts is not always a best practice, but these facts do not raise a plausible inference of bad faith or unreasonableness under these circumstances.

Sarnacki's last challenge is that the SLC's almost exclusive[7] reliance on the Securities Class Action materials was

---

[7] The SLC's reliance on the Securities Class Action discovery was not entirely exclusive. Near the end of the investigation, SLC counsel interviewed seven defendants in the derivative actions unnamed in the Securities Class Action. One SLC member described them as a matter of "wrapping up," but the same member testified

necessarily incomplete. His complaint focuses on forward-looking statements dismissed from the Securities Class Action and names eleven individual defendants unnamed in the class action. These distinctions, he argues, show that relevant information was omitted from the discovery the SLC used.

Insofar as the overlap in materials was extensive, it is also not indicative of any unreasonableness. Sarnacki does not identify a "fact or line of investigation that Defendants missed." Sarnacki, 4 F. Supp. 3d at 327. Though the Securities Class Action did not include discovery about any forward-looking statements, it did include statements of present or historical fact. In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d at 72. The discovery for these claims is significantly similar. The forward-looking statements at issue here are alleged to be materially misleading because they projected growth based on high future demand, while the statements of historical fact at issue in the class action were alleged to be materially misleading because they claimed strong existing demand -- both allegedly in conflict with contemporary internal corporate data. See id. at 74-77. The basic narrative in the two cases is the same: Smith & Wesson and

---

that the class discovery had shown "nothing . . . to warrant further going down further paths," especially in light of the difficulty of proving fraud arising from forward-looking statements. Nonetheless, other than the SLC final report, the record contains no evidence that the SLC members themselves read transcripts or summaries of the interviews.

its management inflated expectations about their sales of guns in 2007 and early 2008 based on assertions about high demand that were false.

The distinctions Sarnacki emphasizes are ones without a difference -- or at least, a difference that was not cured by the SLC's additional interviews. Sarnacki has not identified any key factual predicates which might be discoverable but did not fall within the class action discovery.

At bottom, there is inadequate evidence to permit a reasonable finder of fact to conclude that SLC counsel was conflicted, that the SLC members read too few discovery materials, or that the SLC's involvement was merely perfunctory. On the undisputed facts, the SLC's investigation was reasonable and in good faith.

C. Scope of Discovery Allowed to Sarnacki

Sarnacki concludes by arguing that, at minimum, the district court should have granted broader discovery. In particular, Sarnacki wants access to the communications among the SLC, their counsel, the defendants, and the defendants' counsel. Sarnacki also asks for the minutes of the SLC meetings and the retention agreements between the SLC and its advisors. Since the SLC did not police these relationships, Sarnacki argues, he is entitled to evidence allowing him to probe them for bias.

To succeed, Sarnacki must overcome two hurdles.  First, we review the district court's decisions about the scope of discovery for abuse of discretion, reversing only "upon a clear showing [that] . . . the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party."  United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 719 F.3d 31, 37 (1st Cir. 2013) (alterations in original) (citations and internal quotation marks omitted).  Second, Zapata itself contemplates only "[l]imited discovery . . . to facilitate" the inquiry.  430 A.2d at 788.  This discovery is "intended more as an aid to the Court than it is as a preparation tool for the parties," and "is not afforded to the plaintiff as a matter of right but only to such extent as the Court deems necessary."  Kaplan v. Wyatt, 484 A.2d 501, 510 (Del. Ch. 1984), aff'd 499 A.2d 1184 (Del. 1985).

Sarnacki cites a series of cases in which courts have granted discovery of the type of documents he seeks.  E.g., Zitin v. Turley, No. Civ. 89-2061-PHX-CAM, 1991 WL 283814, at *2-4 (D. Ariz. June 20, 1991) (granting discovery of communications between an SLC and its counsel).  Only one case suggests that plaintiffs should receive that discovery as a matter of course.  Grimes v. DSC Commc'ns Corp., 724 A.2d 561, 567 (Del. Ch. 1998).  But even that case does not suggest that, in the highly fact-intensive context of a Zapata inquiry, a more limited discovery scope is an abuse of

discretion.

In this case, the defendants provided the final SLC report, all documents relied on by the SLC to produce that report, Board minutes regarding the formation and appointment of the SLC, and the SLC members for deposition. Sarnacki, 4 F. Supp. 3d at 321. Sarnacki did not file under Fed. R. Civ. P. 56(d) alleging that it could not present facts in response to the motion for summary dismissal essential to its opposition. See Jones v. Secord, 684 F.3d 1, 6 (1st Cir. 2012) (describing Rule 56(d) as a "safety net for parties that need more time to gather facts essential to resist a motion for summary judgment"). Considering the specific discovery requests in Sarnacki's motions to compel further discovery, the district court decided that they were "overbroad, extending well beyond the intent of the court in permitting limited discovery" and that the "substantial disclosures" already provided were "sufficient to permit [Sarnacki] to build an adequate record." Sarnacki has also failed to mount a serious challenge to the independence, good faith, and reasonableness of the SLC inquiry. The district court decided that the discovery was adequate to aid its review, and that decision was not an abuse of the court's discretion.

III.

After a careful review of the record, we find that Smith & Wesson satisfied the Zapata steps. The judgment of the district court is affirmed.

So ordered.