# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE FITBIT, INC. STOCKHOLDER | : | CONSOLIDATED |
| DERIVATIVE LITIGATION | : | C.A. No. 2017-0402-JRS |

## MEMORANDUM OPINION

Date Submitted: September 6, 2018

Date Decided: December 14, 2018

Peter B. Andrews, Esquire, Craig J. Springer, Esquire and David M. Sborz, Esquire of Andrews & Springer LLC, Wilmington, Delaware; Jessica Zeldin, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Melinda A. Nicholson, Esquire and Michael R. Robinson, Esquire of Kahn Swick & Foti, LLC, Madisonville, Louisiana; Robert C. Schubert, Esquire of Schubert Jonckheer & Kolbe LLP, San Francisco, California; and Edward F. Haber, Esquire of Shapiro Haber & Urmy LLP, Boston, Massachusetts, Attorneys for Plaintiffs.

Elena C. Norman, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware and Jordan Eth, Esquire, Anna Erickson White, Esquire and Ryan M. Keats, Esquire of Morrison & Foerster LLP, San Francisco, California, Attorneys for Defendants James Park, Eric N. Friedman, Jonathan D. Callaghan, Steven Murray, Christopher Paisley, William R. Zerella, and Nominal Defendant Fitbit, Inc.

**SLIGHTS, Vice Chancellor**

In this derivative action, stockholders of Fitbit, Inc. (or the "Company") allege that certain members of the Company's Board of Directors (the "Board") and the chief financial officer breached their fiduciary duties by using insider knowledge of a faulty product to profit personally from the Company's stock issuances. Plaintiffs seek to recover on behalf of the Company the profits realized by the fiduciaries as a result of their breaches.

The alleged insider knowledge concerns the accuracy of Fitbit's "PurePulse™" technology. PurePulse™ was designed to allow Fitbit devices to calculate and record a user's real-time heart rate with superior accuracy. Fitbit hailed the technology as best in class. Indeed, PurePulse™ was meant to differentiate Fitbit from its competitors and soon accounted for almost 80% of the Company's revenue. According to Plaintiffs, however, PurePulse™ was not what it was cracked up to be. As Fitbit touted the promise of its new technology, behind the scenes, PurePulse™ consistently failed accuracy tests and caused "paranoia" among Fitbit management.

Amidst this paranoia, it is alleged that members of the Board manipulated Fitbit's June 18, 2015 initial public offering (the "IPO") and its November 13, 2015 secondary offering (the "Secondary Offering") (together with the IPO, the "Offerings") to prop up active trading notwithstanding PurePulse's failures. The Board first structured the IPO to permit insiders to sell an unusually large percentage of the stock being offered to the market. Then, just a few months later, in advance

1

of the Secondary Offering, the Board voted to waive "lock-up" agreements that were intended to prevent insiders from selling more shares for a period after the IPO. Without the waivers, insiders would have been restricted from transferring shares until March 2016, when the stock traded at a significantly lower price compared to the prevailing price at the time of the Secondary Offering.

Plaintiffs allege that six Fitbit fiduciaries breached their duty of loyalty by structuring the Offerings to favor insiders, and that five of the fiduciaries violated Delaware law by profiting directly from the Offerings based on insider knowledge. Defendants have moved to dismiss under Court of Chancery Rule 23.1 for failure, without excuse, to make a pre-suit demand upon the Board, and Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

In this Memorandum Opinion, I conclude that Plaintiffs have pled particularized facts that raise a reasonable doubt that a majority of the Board could impartially consider Plaintiffs' insider trading and breach of fiduciary duty claims and that Plaintiffs have stated viable claims.[1]  Accordingly, the Motion to Dismiss must be denied.[2]

---

[1] Given these findings, I deny as moot Plaintiffs' Motion to Strike (D.I. 31) the 25 self-selected exhibits spanning over 650 pages that were appended to the Motion to Dismiss.

[2] To be clear, and this must be emphasized given the serious nature of these claims, I have found that Plaintiffs have *alleged* facts that are adequate to survive dismissal given the liberal pleading stage inferences to which they are entitled.  Whether they can *prove* these facts very much remains to be seen.

## I. BACKGROUND

I draw the facts from the allegations in the Verified Second Amended Consolidated Stockholder Derivative Complaint (the "SAC"), documents incorporated by reference or integral to that pleading and judicially noticeable facts.[3] In resolving the Motion to Dismiss, I have accepted as true the SAC's well-pled factual allegations and have drawn all reasonable inferences in Plaintiffs' favor.

### A. The Parties and Relevant Non-Parties

Plaintiffs, Anne Bernstein, Michael Hackett and Bright Agyapong, are current holders of Fitbit common stock. Bernstein and Agyapong have owned Fitbit shares continuously since before the closing of the IPO and Hackett has owned shares continuously since before the Secondary Offering.[4]

---

[3] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (holding that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine). *See also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (holding that where, as here, the nominal defendant has produced documents in response to a demand for books and records under 8 *Del. C.* § 220 on the condition that such documents be deemed incorporated by reference in any complaint that might later be filed, it is appropriate for the Court to consider the documents in their entirety as opposed to only the portions "cherry-picked" by the plaintiff).

[4] Defendants argue that, contrary to the pled facts, none of the Plaintiffs have been stockholders "since prior to the closing of the IPO" (SAC ¶ 22) and, therefore, none of them have standing to prosecute these derivative claims. I decline to address this argument at the pleading stage as it implicates a fact-intensive inquiry that extends beyond the allegations in the SAC or properly considered evidence. With that said, standing is a predicate to the Court's exercise of subject matter jurisdiction and must be addressed as a "threshold issue." *El Paso Pipeline GP Co. LLC v. Brinckerhoff*, 152 A.3d 1248, 1256

Nominal defendant, Fitbit, is a Delaware corporation founded in 2007 that produces wearable devices that monitor health and wellness for consumers.[5] The most well-known of these devices, and the ones relevant here, are Fitbit's fitness wrist bands.

The "Director Defendants," as described below, are those Board members who Plaintiffs allege structured the Offerings to benefit Fitbit insiders and voted to waive the lock-up agreements that permitted Fitbit insiders prematurely to sell stock in the Secondary Offering. The "Selling Defendants" are those Director Defendants and the Company's chief financial officer who Plaintiffs allege personally profited from their inside knowledge of PurePulse's flaws by participating in the Offerings when the market was unaware of this information.

## 1. Director Defendants

Defendant, James Park, is a co-founder of Fitbit and has been its CEO and President since September 2007.[6] Park has served as a member of the Board since

---

(Del. 2016). Accordingly, before the parties commence merits discovery, they shall first engage in limited "standing discovery" to address the discrepancies in Plaintiffs' stock ownership. Upon completion of that discovery, the Court will revisit the standing issue and adjudicate it as "a question of law." *Id. See also Stratton v. American Ind. Ins. Co.*, 2010 WL 37006617, at *8 (Del. Super. Ct. Sept. 16, 2010) (ordering "limited discovery" on the standing issue when the facts as pled in plaintiff's complaint to establish standing were denied by the defendants).

[5] SAC ¶¶ 23, 32.

[6] SAC ¶ 24.

4

March 2007 and as its Chairman since May 2015.[7] Between the IPO and Secondary Offering, Park sold more than 3.3 million shares of Fitbit stock for more than $83 million.[8] He is, therefore, a Selling Defendant.

Defendant, Eric Friedman, is a co-founder of Fitbit.[9] He has been an executive officer of the Company since September 2007 and is currently its Chief Technology Officer.[10] He has also been a member of the Board since March 2007.[11] Between the IPO and Secondary Offering, Friedman sold over 2.2 million shares of Fitbit stock for more than $51 million.[12] He is, therefore, a Selling Defendant.

Defendant, Jonathan Callaghan, has served as a member of the Board since September 2008.[13] Callaghan is also a founder and managing member of True Ventures, a venture capital firm that was an early Fitbit investor and has controlled as much as one third of Fitbit's total voting power.[14] Between June and August

---

[7] *Id.*

[8] *Id.*

[9] SAC ¶ 26.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] SAC ¶ 27.

[14] *Id.* True Ventures II, L.P., an entity affiliated with True Ventures, is the corporate entity that holds Fitbit stock and voting power. *Id.* n.13. True Ventures and its affiliated entities are collectively referred to as "True Ventures."

2013, True Ventures paid $999,999 for 677,904 shares of Fitbit's Series D Convertible Preferred Stock.[15] These shares were automatically converted to Class B shares of the Company in the IPO.[16] During the IPO and Secondary Offering, True Ventures sold over 7.9 million shares of Fitbit stock for more than $195 million.[17] For reasons explained below, Callaghan is a Selling Defendant.

Defendant, Steven Murray, has served as a member of the Board since June 2013.[18] He is a partner at SoftBank Capital, a venture capital firm, where he has worked since 1996.[19] Between June and August 2013, SoftBank paid $15 million for 10,168,572 shares of Fitbit's Series D Convertible Preferred Stock.[20] These shares were automatically converted to Class B shares of the Company in the IPO.[21] During the IPO and Secondary Offering, SoftBank sold over 2 million shares of

---

[15] SAC ¶ 27.

[16] *Id.*

[17] *Id.*

[18] SAC ¶ 28.

[19] *Id.* SoftBank PrinceVille Investments, L.P., an entity affiliated with SoftBank Capital, is the corporate entity that holds Fitbit stock and voting power. *Id.* n.14. SoftBank Capital and its affiliated entities are collectively referred to as "SoftBank."

[20] SAC ¶ 28.

[21] *Id.*

6

Fitbit stock for more than $49 million.[22] For reasons explained below, Murray is a Selling Defendant.

Defendant, Christopher Paisley, has served as a member of the Board since January 2015.[23] He did not sell Fitbit stock during the Offerings and is not, therefore, a Selling Defendant.[24]

## 2. The CFO

Defendant, William Zerella, has served as Fitbit's CFO since June 2014.[25] In connection with the Secondary Offering, Zerella sold 216,000 shares of the Company's stock for more than $6 million.[26] He is, therefore, a Selling Defendant.

## 3. Individual Non-Defendant Directors

Brad Feld was a member of the Board from August 2010 until May 2015.[27] Although he had left the Board at the time of the IPO, Plaintiffs allege that Feld participated in Board discussions regarding the IPO in advance of the offering and continued to attend Board meetings after he left the Board.[28] Feld is a managing

---

[22] *Id.*

[23] SAC ¶ 29.

[24] *Id.*

[25] SAC ¶ 25.

[26] *Id.*

[27] SAC ¶ 30.

[28] *Id.*

member of the Foundry Group Funds.[29]  At the time of the Offerings, the Foundry Group Funds held between 26% and 27% of Fitbit's voting power.[30]  Neither Feld nor the Foundry Group Funds are named as defendants.

Laura Alber and Glenda Flanagan joined the Board after the Offerings.[31] While not named as defendants, they were members of the Board at the time this action was filed and are relevant, therefore, to the demand futility analysis.[32]

## B. Fitbit's PurePulse™ Technology

In September 2012, Fitbit released the Fitbit One™ and Fitbit Zip™ as its first activity trackers that synched wirelessly to smartphones.[33]  The Fitbit Flex™— Fitbit's first wrist-based device—launched in May 2013 and incorporated an LED display of specific user data.[34]  Although these second-generation products tracked more health and wellness data categories than the original "Fitbit™" devices, none measured heart rate activity.[35]  In October 2013, the Company launched the Fitbit

---

[29] *Id.*

[30] *Id.*

[31] SAC ¶ 31.

[32] *Id.*

[33] SAC ¶ 36.

[34] SAC ¶ 37.

[35] Pls.' Corrected Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("PAB") 6 (D.I. 33).

8

Force®, which added new features to the Flex™.[36] The Force® was a "lemon," however, that ultimately prompted lawsuits and a product recall after widespread complaints of skin irritation.[37] In the wake of the Force® fiasco, Fitbit was left with an inventory of dated and unmarketable products.[38] It was in need of an innovative device that would drive sales and continue growth.[39]

In October 2014, Fitbit announced its development of PurePulse™, a wrist-based heart rate monitoring technology.[40] A launch of two devices featuring the technology, the Charge HR™ and the Surge™, followed soon after.[41] The incorporation of heart rate data allowed Fitbit to market important health metrics and to raise the price of the products containing PurePulse™ technology.[42] Indeed, the price of the Charge HR™ was half again the price of essentially the same device without PurePulse™.[43]

---

[36] SAC ¶ 39.

[37] *Id*.

[38] *Id.*

[39] *Id*.

[40] SAC ¶ 40.

[41] SAC ¶ 41.

[42] SAC ¶¶ 43, 45.

[43] SAC ¶ 45.

Fitbit implemented an aggressive marketing campaign featuring its heart rate tracking technology leading up to the IPO.[44] For instance, a Fitbit press release issued on October 27, 2014, claimed that PurePulse™ "'provides continuous and automatic wrist-based heart rate tracking, without an uncomfortable chest strap . . . and applies Fitbit's finely tuned algorithms to deliver heart rate tracking 24/7.'"[45] Fitbit's advertising campaign in late 2014–2015 also proclaimed the efficacy—and significance—of PurePulse™ technology with slogans like: "The Difference Between Good and Great . . . Is Heart"; "For Better Fitness, Start with Heart"; "Get More Benefits with Every Beat—Without an Uncomfortable Chest Strap"; "Every Beat Counts"; and "Know Your Heart."[46] On February 12, 2015, Fitbit's website featured a blog post from an ultra-marathoner who wrote

> [A] heart rate monitor is an invaluable tool for maximizing your training . . . .
>
> When I'm training, I monitor my heart rate to stay within certain parameters during certain stages of the run . . . during interval training I push toward the upper ranges for set intervals of time during speed bursts.
>
> To make the most out of your ChargeHR or Surge, wear it 24/7 to get used to watching fluctuations in your heartbeat and correlating those

---

[44] SAC ¶ 47.

[45] *Id.*

[46] SAC ¶ 49.

with the way you feel. This will give you a more innate understanding of how your body works . . . .[47]

What Fitbit did not tout, or even reveal, is that PurePulse™ only worked at low or resting heart rates.[48]

## C. The Real PurePulse™ Story

The truth, as Plaintiffs allege it, is that PurePulse™ was "wildly inaccurate"; and only people within Fitbit, including the Selling Defendants, knew it.[49] Internal PurePulse™ testing results for the fifteen months preceding the Secondary Offering consistently showed that PurePulse™ had accuracy problems that were never sufficiently addressed.[50] As early as September 2014—the month before the technology was announced—heart rate measuring errors reached as high as 53% in testing.[51] A month later, errors still remained near 35%.[52]

Fitbit tracked PurePulse's developing problems and its executives were updated monthly on these issues through summary presentations.[53] An internal

---

[47] SAC ¶ 52.

[48] SAC ¶ 50.

[49] SAC ¶ 88.

[50] SAC ¶ 103.

[51] *Id.*

[52] *Id.*

[53] SAC ¶¶ 104–05.

presentation, dated January 22, 2015, which was emailed to Friedman, identified "Heart Rate Sensor Failing" as the most common problem reported by users for returned devices.[54] The presentation also notes, "Sensor testing—[heart rate monitor ('HRM')] continuing investigation possible noise/crosstalk issue," suggesting that Fitbit had begun to investigate its heart rate monitoring devices before the end of January 2015.[55] On February 19, 2015, Park and Friedman received an "Executive Update" dated "January & February 2015."[56] This presentation included charts summarizing analyses of returned Charge HR™ and Surge™ units.[57] For Charge HR™ devices, "HRM not working" was the most common "symptom/defect."[58] "Data accuracy" was also noted as a common "symptom/defect."[59] For Surge™ devices, "Heart Rate Sensor Failing" was the prevailing defect.[60] These same concerns were reiterated in subsequent presentations emailed to Friedman.[61]

---

[54] SAC ¶ 105.

[55] SAC ¶ 106.

[56] SAC ¶ 107.

[57] SAC ¶¶ 107–08.

[58] SAC ¶ 107.

[59] *Id.*

[60] SAC ¶ 108.

[61] SAC ¶ 109.

Fitbit attempted to develop various technological repairs or enhancements to address the PurePulse™ flaws.[62] In May 2015, Friedman received a presentation informing him and other Fitbit executives of the Company's efforts to correct the heart rate technology.[63] Specifically, Fitbit had begun developing a software algorithm codenamed "Hydra" that could be incorporated into future products to reduce the misreporting of heart rate data.[64] The May 2015 presentation noted that the "Hydra team" had "previously" presented a laboratory analysis showing improvements for workout and running modes.[65] The presentation also included charts documenting the results of comparisons between a chest strap monitor and the version of the Surge™ without Hydra (i.e., the version available for purchase on the market).[66] During running or similarly stressful activities, the Surge™ substantially underreported heart rates by roughly 10–40 beats per minute.[67] During biking, the Surge™ underreported heart rates by as much as 50 beats per minute.[68] During

---

[62] SAC ¶ 110.

[63] *Id*.

[64] *Id.*

[65] SAC ¶ 111.

[66] SAC ¶ 112.

[67] SAC ¶¶ 112–13.

[68] SAC ¶ 114.

spinning (i.e., stationary bicycling), the Surge™ reported "heart rates . . . almost unintelligible for the test subject, swinging wildly back and forth from as much as 160 beats per minute to below 100 beats per minute."[69]  It is alleged that Friedman received this presentation just as Fitbit coincidentally was accelerating its efforts to commence the IPO.[70]

Despite reports of PurePulse's inaccuracy, Fitbit and its executives continued to hold out the technology as the differentiator in the wellness tracker industry.  The Company's IPO Prospectus, issued on June 18, 2015, repeated positive claims about the devices' "highly accurate measurements."[71]  Among other things, the Prospectus lauded that Fitbit is a leader in the industry because its "health and fitness devices leverage industry-standard technologies . . . as well as proprietary technologies, such as [its] PurePulse continuous heart rate tracking and [its] algorithms that more accurately measure and analyze user health and fitness metrics."[72]

---

[69] SAC ¶ 115.

[70] SAC ¶ 110.

[71] SAC ¶¶ 5 n.3, 91.

[72] SAC ¶ 66.

### D. The Fitbit IPO and Lock-up Agreements

Fitbit's public statements with respect to PurePulse™-equipped devices led to investor enthusiasm and a strong reception for the IPO.[73] It is alleged that, in the midst of this artificially positive response, Fitbit insiders took advantage of their confidential knowledge about PurePulse™ to structure the IPO in their favor.[74]

#### 1. The IPO Structure

The Board structured Fitbit's IPO to permit Park, Friedman, Callaghan, Murray and the Foundry Group Funds to provide more than 39% of the approximately 36.6 million IPO shares.[75] And Fitbit fiduciaries, not the Company, contributed the overallotment of roughly 5.5 million shares.[76] Since the overallotment was fully exercised, the fiduciaries' shares ultimately came to 47% of all shares sold in the IPO.[77]

The Selling Defendants' plan to unload unusually large blocks of Fitbit stock began as early as February 27, 2015, when the Board and Zerella held a meeting to

---

[73] SAC ¶ 5.

[74] SAC ¶ 2.

[75] SAC ¶ 55.

[76] *Id.*

[77] *Id.*

discuss the IPO.[78]  On May 1, 2015, the IPO Pricing Committee (consisting of Callaghan, Murray and Paisley) determined the number of shares that Park, Friedman, Callaghan and Murray could sell.[79]  That same day, the Board designated Callaghan as its lead independent director.[80]  Murray and Callaghan's respective firms proceeded to collect nearly $75 million through the IPO, with Callaghan's True Venture's share accounting for nearly $60 million.[81]

As often occurs in an initial public offering process, Fitbit insiders entered lock-up agreements with Fitbit IPO underwriters that prohibited insiders from selling Fitbit stock until December 14, 2015—180 days after the IPO.[82]  Because December 14, 2015 fell during a "blackout period," Selling Defendants would have been prohibited from selling additional Fitbit shares until March 1, 2016, had the lock-up agreements remained in place.[83]

---

[78] SAC ¶¶ 54–57.

[79] SAC ¶¶ 61, 63.

[80] SAC ¶ 62.  Plaintiffs allege that this designation is problematic because, on February 17, 2015, Callaghan had resigned from his service on the Audit Committee "due to lack of independence." *Id.*

[81] SAC ¶ 63.

[82] SAC ¶¶ 70–71.

[83] SAC ¶ 143. The "blackout period" prohibits insiders from selling stock during a designated time around the release of the Company's quarterly earnings. *Id.*

## 2. The IPO Sales

On June 17, 2015, the SEC declared effective Fitbit's IPO Registration Statement, which incorporated by reference the IPO Prospectus and related IPO filings.[84] As noted, the IPO Prospectus advertised Fitbit's role as a leader in health and fitness because of its PurePulse™ technology and "highly accurate" devices.[85] The SEC filings also underscored the importance of PurePulse™ devices to Fitbit's bottom line, stating that "the Fitbit Charge™, Fitbit Charge HR™, and Fitbit Surge™ . . . were the primary drivers of our revenue growth in the first quarter of 2015."[86] Notably, concerns regarding the accuracy of the PurePulse™ technology and Company efforts to correct the problems were nowhere to be found in the IPO disclosures.[87]

Fitbit conducted its IPO on June 18, 2015, and sold over 22 million shares at $20 per share, raising approximately $416 million in proceeds.[88] Park, Friedman, Callaghan and Murray sold about 6.2 million shares for over $115 million.[89] The

---

[84] SAC ¶ 65.

[85] *See* SAC ¶¶ 66, 91.

[86] SAC ¶ 96.

[87] SAC ¶ 68.

[88] SAC ¶ 67.

[89] SAC ¶ 6.

proceeds, as broken down by Selling Defendant, are depicted in the following chart[90]:

| Selling Defendant | Shares Sold | Proceeds |
|---|---|---|
| Park | 1,095,817 | $20,601,359.60 |
| Friedman | 1,095,817 | $20,601,359.60 |
| Callaghan | 3,133,707 | $58,913,691.60 |
| Murray | 825,000 | $15,510,000.00 |
| **Totals** | **6,150,341** | **$115,626,410.80** |

## E. The Fitbit Secondary Offering, Lock-up Waivers and Additional Insider Stock Sales

In the months that followed the IPO, Fitbit's now-publicly traded common stock traded above the $20 IPO price, reaching a high of $51.64 on August 5, 2015.[91] The Company continued to herald PurePulse™ technology and to introduce purported advancements.[92]  According to Fitbit, the software updates "improve[d] upon an already positive heart rate tracking offering."[93]  Around this time, Park

---

[90] PAB 12.  Within the chart, True Ventures-owned Fitbit stock is attributed to Callaghan, and Softbank-owned Fitbit stock is attributed to Murray.  SAC ¶¶ 27–28.

[91] SAC ¶ 69.

[92] SAC ¶ 86.

[93] *Id.*

professed on an earnings call that he had "never been more confident in Fitbit's future."[94]   Behind the scenes, however, a different story was playing out.   On June 23, 2015, five days after Fitbit's IPO, Fitbit management circulated an internal memorandum that included an analysis of ways to improve PurePulse's accuracy and noted thousands of customer complaints about heart-rate monitoring.[95]   The next month, Friedman received a presentation concerning updates on the status of testing the Hydra algorithm.[96]   The presentation described additional challenges in the research process to improve the PurePulse™ technology, including that "Hydra workout algorithms are ill-suited to walking and can result in HR [heart rate] overestimation."[97]

At this point, Hydra remained a work in progress and was not ready to be implemented in new devices.[98]  A July 20, 2015 executive presentation specifically highlighted testing results and the poor performance of the PurePulse™ technology and confirmed that the development of the Hydra algorithm was "ongoing."[99]

---

[94] SAC ¶ 89 (citing James Park, Nov. 2, 2015, Fitbit Earnings Call).

[95] SAC ¶ 116.  Park received the memorandum by email on July 17, 2015.  *Id.*

[96] SAC ¶ 117.

[97] *Id.*

[98] *Id.*

[99] SAC ¶¶ 12, 118.  Plaintiffs allege Friedman and Park reviewed the presentation and Friedman received the presentation by email on July 19, 2015.  SAC ¶ 118.

Notably, the communication circulating this presentation expressed pervasive concern regarding public disclosure of PurePulse's flaws:

> [Friedman] & [Park] instructed us that these slides not be distributed in any form as a leave behind, whether it be printed, emailed, Dropbox'ed etc. at the end of the session.
>
> Frankly, I think they'd like you to destroy the slides once the presentation is over, but I've cc'ed [Friedman] so that he can correct the appropriate level of paranoia if I got it wrong ☺.[100]

Defendants began planning for the Secondary Offering during a Board meeting on July 30, 2015, or just over a week after this email was circulated internally within Fitbit.[101] At the meeting, the Board reviewed a presentation from an advisor in which it was observed that, since 2011, only a "small subgroup" of companies that had conducted an IPO in Fitbit's range of success had quickly thereafter conducted a secondary offering.[102]

Another presentation emailed to Friedman on October 20, 2015, a few weeks before the Secondary Offering issued, listed "Improve heart rate accuracy during exercise" as Fitbit's first objective for the third quarter.[103] The presentation also detailed continued improvement efforts behind Hydra as well as "Project Tiwi,"

---

[100] SAC ¶ 12 (emphasis omitted) (smiley emoji in original).

[101] SAC ¶¶ 73–74.

[102] SAC ¶ 73.

[103] SAC ¶ 119.

which was described as a "hardware" solution to the problem of "heart rate accuracy."[104]

On October 28, 2015, with Morgan Stanley representing the Fitbit IPO underwriters in attendance, the Board approved the Secondary Offering and a waiver of the lock-up agreements.[105] Fitbit publicly announced the waivers in a Form 8-K on November 2, 2015,[106] and contemporaneously filed a Form S-1 announcing the Secondary Offering.[107] The Form S-1 stated that the Secondary Offering would include 21 million shares, with the Company offering seven million shares and the Selling Defendants (along with the Foundry Group Funds) offering the remaining 14 million shares.[108] The Selling Defendants also offered the underwriters an option for an overallotment of 3.15 million shares.[109] If the underwriters exercised the

---

[104] *Id.*

[105] SAC ¶¶ 76–77. "[I]n connection with the Public Offering, Morgan Stanley, on behalf of the Underwriters, has agreed to release certain of the Company's employees and contractors (the "Eligible Service Providers") . . . from the IPO Lock-Up Agreements with respect to 10% of the aggregate number of shares of Class A Common Stock . . . ." SAC ¶ 77 (citing Oct. 28, 2015 meeting minutes, Ex. A).

[106] SAC ¶ 78.

[107] SAC ¶ 79.

[108] *Id.*

[109] *Id.*

overallotment option, the Selling Defendants' shares would account for 71% of the Secondary Offering.[110] The Company did not offer an overallotment option.[111]

On November 12, 2015, the Board revised the terms of the Secondary Offering to remove four million shares from what Fitbit intended to sell, thereby increasing the likelihood that the underwriters would exercise the Selling Defendants' overallotment option.[112] After these changes, the Selling Defendants were set to offer roughly 85% of the Secondary Offering shares.[113]

Fitbit's Secondary Offering Registration Statement and Prospectus contained the same descriptions as the IPO filings with respect to Fitbit's devices and competitive strengths.[114] Nevertheless, as with the Company's IPO, Defendants continued to appreciate at the time of the Secondary Offering that Fitbit's PurePulse™ technology was flawed.[115] In spite of this knowledge, the Board proceeded with the Secondary Offering on November 18, 2015, and the Selling Defendants sold 9.62 million shares of Fitbit stock at $28.13 per share for proceeds

---

[110] SAC ¶ 82.

[111] SAC ¶ 79.

[112] SAC ¶¶ 82–84.

[113] SAC ¶ 84.

[114] SAC ¶¶ 91–92.

[115] SAC ¶ 127.

exceeding $270 million.[116]  The proceeds, as broken down by Selling Defendant, are

depicted in the chart below[117]:

| Selling Defendant | Shares Sold | Proceeds |
|---|---|---|
| Park | 2,226,980 | $62,644,947.40 |
| Friedman | 1,113,490 | $31,322,473.70 |
| Callaghan | 4,860,338 | $136,721,307.94 |
| Murray | 1,203,579 | $33,856,677.27 |
| Zerella | 216,000 | $6,076,080.00 |
| **Totals** | **9,620,387** | **$270,621,486.31** |

## F. The PurePulse™ Problems Are Revealed

Fitbit's devices with PurePulse™ technology continued to fail tests, with

results varying by user activity, age, gender and skin color, as late as December

2015.[118]  On January 5, 2016, the cat was let out of the bag when a consumer class

action was filed, captioned *McLellan, et al. v. Fitbit, Inc.*, 3:16-cv-00036-JD

---

[116] SAC ¶¶ 139–40, 144.  The Selling Defendants collected $386 million between the IPO and the Secondary Offering.  SAC ¶ 140.

[117] PAB 25.  Here again, within the chart, True Ventures-owned Fitbit stock is attributed to Callaghan, and Softbank-owned Fitbit stock is attributed to Murray.  SAC ¶¶ 27–28.

[118] SAC ¶ 104.

(N.D. Cal. Jan. 5, 2016) (the "Consumer Action").[119]  The plaintiffs in that lawsuit

alleged:

> Expert analysis has further corroborated the inability of the PurePulse™ Trackers to perform as promised and warranted.  A board-certified cardiologist tested the PurePulse™ Trackers against an electrocardiogram ("ECG"), the gold standard of heart rate monitoring, on a number of subjects at various exercising intensities . . . .
>
> The results were as expected: the PurePulse™ Trackers consistently misrecorded the heart rates by a significant degree.  At intensities over 110 bpm [beats per minute], the Heart Rate Trackers often failed to record any heart rate at all. And even when they did record heart rates, the Heart Rate trackers were inaccurate by an average of 24.34 bpm, with some readings off by as much as 75 bpm. With those margins of error, the Heart Rate Trackers are effectively worthless as heart rate monitoring devices.[120]

On the day the Consumer Action was filed, the intraday high for Fitbit stock was

$30.96.[121]  Just two days later, the stock hit a low of $20.25—a drop of more than

33%.[122]  As alleged, the stock devaluation was caused by the unanticipated release

of the truth about PurePulse™: the technology did not work and Fitbit could not fix

it.[123]

---

[119] SAC ¶¶ 15 n.9, 145.

[120] SAC ¶ 145.

[121] SAC ¶ 146.

[122] *Id.*

[123] SAC ¶ 15.

On March 1, 2016, the earliest date the Selling Defendants would have been able to sell their shares had the lock-up agreements remained in place, Fitbit stock traded at $12.35 per share.[124] At the time the SAC was filed, Fitbit stock traded at $5.00 per share.[125]

## G. Procedural History

This past summer, Judge James Donato of the Unites States District Court for the Northern District of California denied Fitbit's motion to dismiss the Consumer Action.[126] In January 2016, a federal securities class action, captioned *Robb v. Fitbit Inc., et al.*, 3:16-cv-00151-SI (N.D. Cal. Jan. 11, 2016) (the "Securities Action"), was also filed, which alleged securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, and violations of Sections 11 and 15 of the Securities Act of 1933, for issuing materially false or misleading statements related to IPO sales.[127] All Defendants—Park, Friedman, Zerella, Callaghan,

---

[124] SAC ¶¶ 143–44.

[125] SAC ¶ 154.

[126] Compendium of Unreported Authorities Cited in PAB ("Pls.' Compendium") Tab 3 (*McLellan v. Fitbit, Inc.*, Case No. 3:16-cv-00036-JD (N.D. Cal. June 5, 2018) (ORDER)). The order stated, "Given the magnitude of the aberrant heart rate readings and multiple allegations that the devices under-report heart rate, [plaintiff] has plausibly alleged an 'unreasonable safety hazard' that may arise when users rely on Fitbit heart rate readings during exercise." *Id.* at 4.

[127] SAC ¶¶ 15, 17.

Murray and Paisley—were named as individual defendants in the Securities Action.[128] On October 26, 2016, Judge Susan Illston denied the defendants' motion to dismiss the Securities Action and thereafter denied the defendants' motion for partial reconsideration.[129] The Securities Action was settled on April 23, 2018, nearly a year after this action commenced.[130]

This stockholder derivative action is the result of a Court-ordered consolidation of three complaints, the first of which was filed on May 26, 2017.[131] The operative complaint was amended on June 30, 2017, and again on March 20, 2018 in response to the consolidations.[132] On April 4, 2018, Defendants moved to dismiss the SAC under Court of Chancery Rules 23.1 and 12(b)(6).[133]

---

[128] Pls.' Compendium Tab 2 (*Robb v. Fitbit, Inc.*, Case No. 16-cv-00151-SI, at 3 n.3 (N.D. Cal. Oct. 26, 2016) (ORDER) (denying motion to dismiss)).

[129] *Id*. at 3; Pls.' Compendium Tab 1 (*Robb v. Fitbit, Inc.*, Case No. 16-cv-00151-SI, at 3 (N.D. Cal. Jan. 19, 2017) (ORDER) (denying motion for partial reconsideration)).

[130] Opening Br. in Supp. of Defs.' Mot. to Dismiss ("DOB") 14 (D.I. 21); Transmittal Aff. of Nicholas Rohrer in Supp. of DOB ("Rohrer Aff."), Ex. 18 (D.I. 22).

[131] Bernstein initiated a derivative action on May 26, 2017, captioned *Bernstein v. James Park, et al.*, C.A. No. 2017-0402-JRS (D.I. 1). Hackett initiated an action on June 9, 2017, captioned *Hackett v. James Park, et al.*, C.A. No. 2017-0444-JRS. On June 21, 2017, the Court consolidated these actions into the present Action (D.I. 6). Agyapong initiated his derivative action on August 8, 2017, captioned *Agyapong v. Park, et al.*, C.A. No. 2017-0562-JRS. The Court consolidated that action with this one on September 8, 2017 (D.I. 11).

[132] D.I. 7, D.I. 18.

[133] D.I. 20.

## II. ANALYSIS

The SAC states two causes of action: Count I is a derivative claim for breach of fiduciary duty (i) against all Defendants for allowing the Selling Defendants to sell stock in the Offerings based on insider information and (ii) against the Director Defendants for waiving the lock-up agreements[134]; Count II is a derivative claim for breach of fiduciary duty against the Selling Defendants under *Brophy v. Cities Service Co.*,[135] which permits a corporation to recover from its fiduciaries for harm caused by insider trading.[136]

I start my analysis with an assessment of Plaintiffs' showcase claim (the *Brophy* claim), as stated in Count II, and conclude that Plaintiffs have pled particularized facts that "create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[137] I next consider whether Plaintiffs have pled demand futility with respect to the Board's decision to waive the lock-up agreements, as alleged in Count I. Again, I find that they have.

---

[134] SAC ¶¶ 199–204.

[135] 70 A.2d 5 (Del. Ch. 1949).

[136] SAC ¶¶ 205–11.

[137] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). The parties agree that both of Plaintiffs' claims are derivative. *See* DOB 18–19, PAB 29.

I therefore deny the Motion to Dismiss under Rule 23.1. Because I find in the demand futility analysis that the SAC states viable claims, I deny the motion to dismiss under Rule 12(b)(6) as well.

## A. Legal Standard

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[138] Accordingly, where a plaintiff seeks to file a derivative suit—which "[b]y its very nature . . . impinges on the managerial freedom of directors"—the plaintiff must cross a threshold framed by Rule 23.1.[139] To meet the requirements, the plaintiff must demand that the board pursue the claim or, alternatively, must demonstrate that demand on the board would be futile such that the demand requirement should be excused.[140]

Plaintiffs acknowledge they made no pre-suit demand upon the Board.[141] Thus, they also acknowledge they must plead demand futility by meeting Rule 23.1's "stringent requirements of factual particularity that differ substantially

---

[138] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (citing 8 *Del. C.* § 141(a)).

[139] *Aronson*, 473 A.2d at 811.

[140] *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

[141] SAC ¶ 180.

from the permissive notice pleadings" embodied in Chancery Rule 8 and facilitated by Rule 12(b)(6)'s reasonable conceivability standard.[142]

A plaintiff can satisfy Rule 23.1 only by setting forth "particularized factual statements that are essential to the claim."[143] In that sense, as noted, conclusory statements or mere notice pleading are insufficient to satisfy Rule 23.1.[144] "The pleader is not required to plead evidence,"[145] however, and "all reasonable inferences from the pled facts must . . . be drawn in favor of the plaintiff in determining whether the plaintiff has met its burden under *Aronson*."[146]

## B. The "Demand Board"

The goal of a demand futility analysis is to determine "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations."[147] With this in mind, Plaintiffs maintain that demand futility must be assessed in reference to the seven-member Board as comprised at the time the first complaint in this consolidated action was filed on

---

[142] *Brehm*, 746 A.2d at 254.

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015).

[147] *Rales*, 634 A.2d at 934.

May 26, 2017. Defendants see it differently and argue that demand futility should be evaluated against Fitbit's board as it existed—with nine members—when the SAC was filed.[148] I agree with Plaintiffs.

Under *Braddock v. Zimmerman*,[149] a plaintiff is excused from making a (new) demand on the board in place at the time an amended (as opposed to original) complaint is filed when three elements are present: "first, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint."[150] Of these factors, Defendants challenge only whether the original complaint satisfied the legal test for demand excusal. As explained below, because I find that demand was excused in connection with the original complaint, I am satisfied under *Braddock* that there would have been no need to make a new demand at the time the SAC was filed. Accordingly, I evaluate demand futility with respect to the Board that existed at the time the original complaint was filed (the "Demand Board").

---

[148] Reply Br. in Further Supp. of Defs.' Mot. to Dismiss ("DRB") 28 (D.I. 39).

[149] 906 A.2d 776 (Del. 2006).

[150] *Id.* at 786.

## C. Count II – The *Brophy* Claim

The parties agree that the test set forth in *Rales v. Blasband* governs demand futility with respect to Count II.[151]  As noted, under *Rales*, demand is excused only if the plaintiff's particularized factual allegations "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[152]  A board will be deemed interested in a transaction and unable to make an impartial decision in response to a demand if a majority of the members face "a 'substantial likelihood' of personal liability."[153]

In this case, the demand futility question as to Count II turns on whether a majority of the Demand Board faces a substantial likelihood of liability on the *Brophy* claim.  As to that claim, Plaintiffs are required to well-plead that Fitbit insiders: "1) . . . possessed material, nonpublic company information; and 2) . . . used that information improperly by making trades because [they were] motivated, in whole or in part, by the substance of that information."[154]  I address these elements in turn.

---

[151] *See* DOB 22, PAB 29.

[152] *Rales*, 634 A.2d at 934.

[153] *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (quoting *Rales*, 634 A.2d at 936).

[154] *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004).  *See also Guttman*, 823 A.2d at 502 ("The balanced approach that is more in keeping with the spirit of [*Aronson* and *Rales*]

31

**1. The SAC Well-Pleads that Knowledge of PurePulse™'s Design Flaws and the Company's Attempts To Fix Them Were Material and Nonpublic**

Plaintiffs allege the Selling Defendants had reason to know that PurePulse™ devices had serious problems with accurately reporting heart rates and that Fitbit was struggling to fix those problems. The Selling Defendants counter that these issues were well known in the market and by no means the subject of inside information. Relying mostly on negative online consumer reviews, the Selling Defendants claim that "the market was flooded with information about the accuracy of the heart-rate trackers."[155] The Selling Defendants also maintain that the internal documents on which Plaintiffs rely do not conflict with Fitbit's public statements. According to the Selling Defendants, both acknowledge that "there were issues with

---

is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from the particularized facts that) they knew material, non-public information about the Company's financial condition.").

[155] DRB 17; *see, e.g.*, Rohrer Aff., Ex. 28 at ¶ 156 ("However, as early as January 2015, product reviews on Amazon.com reported that the Charge HR was 'absolutely horrible for tracking heart rate during exercise,' 'completely inaccurate if you're doing anything besides steady state cardio like a jog,' 'horribly inaccurate when doing any . . . high intensity interval training,' 'fairly useless as a HR monitor during any exercise other than jogging,' and prone to under-reporting users' heart rates by up to 50%.").

the accuracy of the heart-rate tracking devices under certain circumstances, with certain users, for some exercises."[156]

The Selling Defendants misconstrue the information Plaintiffs allege was nonpublic. The challenged information is not that *some* consumers experienced *some* issues with PurePulse™-equipped devices. Rather, it is the alleged internal discussions regarding the scope and severity of PurePulse's technology problems, and the Company's persistent inability to fix them, that Plaintiffs allege was known by the insider traders but not by the public. In this regard, Plaintiffs point to internal documents showing that PurePulse's flaws were so significant that the Company could not resolve them even after developing a curative algorithm (Project Hydra) and hardware solution (Project Tiwi).[157] Moreover, Plaintiffs have alleged with particularity that at least Park and Friedman made an effort to keep these failures confidential by directing employees to destroy documents in which management was recounting the problems and the failed efforts to solve them.[158] All the while, Fitbit issued public statements claiming that PurePulse™ devices could track heart rates

---

[156] DRB 20–21.

[157] SAC ¶¶ 104–19.

[158] SAC ¶ 12. *See also* Pls.' Compendium Tab 4 (*Diep v. Sather, et. al.*, C.A. No. 12760-VCL (Del. Ch. Mar. 17, 2017) (TRANSCRIPT) ("The fact that they had been locked up for awhile and that this was the first time they could sell . . . heightens the likelihood that there was incentive to keep this information quiet until people could at least unload something.")).

with a high degree of accuracy.  Contrary to Defendants' argument, a statement in the IPO Prospectus that Fitbit "must continually . . . improve and enhance our existing products" does not sufficiently temper the Company's endorsement of PurePulse™ or its bullish forecast of the Company's future, fueled by sales of products with PurePulse™ technology.[159]

Judge Illston determined on a motion to dismiss the Securities Action that the precipitous and continuous decline in the Fitbit stock price following the filing of the Consumer Action plausibly suggested the market did not know about the severity of PurePulse's flaws.[160]  The Selling Defendants respond to that finding with several reasons why the stock price declined the way it did.[161]  Those reasons may well prove true on a developed record.  For now, however, just as the federal court found it plausible that the market's discovery of the PurePulse™ issues prompted the decline in stock price, I find that the causal connection is pled with particularity and is reasonably conceivable.  Plaintiffs have adequately pled that the information at issue was material and nonpublic.

---

[159] DRB 22 (citing Rohrer Aff., Ex. 1 at 16).

[160] Pls.' Compendium Tab 2 at 18–19.

[161] *See, e.g.*, DOB 33 (arguing that on the same day as the filing of the Consumer Action, the Company launched a new product, the Fitbit Blaze™, which analysts panned); *id*. 33–34 (arguing that the Indianapolis local news report concerning the results of the Ball State Study on the accuracy of Fitbit devices aired on the same day that Fitbit announced its first financial guidance for Q1 and FY 2016, which fell below analysts' expectations).

## 2. The SAC Well Pleads that the Selling Defendants Acted With Scienter When They Sold Their Fitbit Shares

The second *Brophy* element requires a plaintiff to well-plead (and ultimately prove) that the corporate fiduciary used material inside information he possessed to make trades based, at least in part, on the substance of that information.[162] In other words, Plaintiffs must show that the Selling Defendants acted with scienter.[163]

In seeking dismissal, Defendants call the predicate question of whether Plaintiffs have adequately pled that all of the Selling Defendants actually sold stock in the Offerings. In doing so, Defendants implicitly question whether Plaintiffs have well-pled that a majority of the Demand Board faces a substantial likelihood of liability on the *Brophy* claim. It is undisputed that Park and Friedman sold their Fitbit shares during the IPO and the Secondary Offering.[164] The parties disagree, however, as to whether True Ventures's and SoftBank's sales during the Offerings can be attributed to Callaghan and Murray, respectively. Defendants argue that Plaintiffs have failed to allege facts showing that Callaghan and Murray benefited

---

[162] *Silverberg ex rel. Dendreon Corp. v. Gold*, 2013 WL 6859282, at *14 (Del. Ch. Dec. 31, 2013).

[163] *Guttman*, 823 A.2d at 505.

[164] DRB 1 ("[O]nly two Directors of Fitbit's seven-member demand board—Park and Friedman—personally sold stock.").

35

financially from their funds' sales.[165]  They also claim that Callaghan and Murray could only be disabled from considering a pre-suit demand as a consequence of these sales if Plaintiffs had named True Ventures and Softbank as defendants, which they did not do.[166]  Neither argument is persuasive.

The parties have not provided (and the Court has not found) any instance where a Delaware court has considered whether a fiduciary may be held liable on a *Brophy* claim for trades that an entity or fund associated with that fiduciary executed in its name.  While I see no basis or reason to state a hard and fast rule, I am satisfied that finding *ipso jure* that the True Ventures and Softbank trades cannot be attributed to Callaghan and Murray would frustrate the policy that animates *Brophy*.  Chancellor Harrington's *Brophy* decision is a descendant of Chief Justice Layton's seminal *Guth v. Loft, Inc.* decision, in which our Supreme Court elucidated the scope of the fiduciary duty of loyalty and the range of remedies available to address a fiduciary's usurpation of a corporate opportunity[167]:

> [T]he law charges the interest so acquired with a trust for the benefit of the corporation . . . while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, . . . rest[s] . . . upon a broader foundation of a wise public policy that, for the purpose

---

[165] DRB 8.

[166] DRB 9; Oral Arg. on Defs.' Mot. to Dismiss Tr. 46:1–12 (Sept. 6, 2018) (D.I. 50).

[167] 5 A.2d 503 (Del. 1939).

of removing all temptation, *extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation*.[168]

*Brophy* applied this policy to insider trading, recognizing that "[p]ublic policy will not permit an employee occupying a position of trust and confidence toward his employer to abuse that relation to his own profit, regardless of whether his employer suffers a loss."[169]

Here, the Selling Defendants seek a ruling that would permit a director to trade on inside material information without consequence just because the director did not trade personally but rather passed the information to an entity with which he is affiliated (and over which he exercised control) to do the trading. That is not and cannot be our law. Indeed, to allow these directors, through their controlled funds, to profit from inside information without recourse would be inconsistent with the policy of "extinguish[ing] all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation" that undergirds Delaware's insider trading law.[170]

---

[168] *Id.* at 510 (emphasis supplied).

[169] *Brophy*, 70 A.2d at 8. *See also Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 840 (Del. 2011) (citing *Guth* in its refusal to restrict disgorgement in *Brophy* cases and explaining that "*Brophy* focused on the public policy of preventing unjust enrichment based on the misuse of confidential corporate information").

[170] I also note that *Brophy* liability in this context is akin to tipper liability under federal law. Under *Dirks v. Sec. & Exch. Comm'n*, 463 U.S. 646 (1983), a tipper of inside information can be liable only if the tipper personally benefited from the disclosure of inside information. In *Salman v. United States*, 137 S. Ct. 420 (2016), the Supreme Court

Although no Delaware court has had occasion to consider whether *Brophy* liability should be imposed under these circumstances, our courts have not foreclosed the possibility of personal liability for trades executed by a controlled fund either. In *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, for example, our Supreme Court addressed a case in which plaintiffs alleged that designated directors supplied nonpublic information to the directors' sponsoring fund, which then traded on the information. Although the court upheld the special committee's recommendation not to pursue the *Brophy* claims, that ruling did not rest on a holding that the directors could not, as a matter of law, be held liable for the improper trades of their funds. Rather, the Court determined that the insider information was immaterial, the claims were time-barred and the sponsor did not intend to profit (and in fact did not profit) from the trades.[171]

Callaghan and Murray are not simply board designees for their funds.[172] Plaintiffs allege that Callaghan is a co-founder and managing member of True Ventures, which held 37,731,585 Fitbit shares and received approximately

---

unanimously held that the requirement of personal benefit could be satisfied by a tipper's gift of inside information to a trading friend or relative.

[171] *See Kahn*, 23 A.3d at 841.

[172] Thus, Defendants' reliance on *In re Rouse Props., Inc. Fiduciary Litig.*, 2018 WL 1226015 (Del. Ch. Mar. 9, 2018) and *Gilbert v. El Paso Co.*, 575 A.2d 1131 (Del. 1990) is misplaced.

$136.7 million in proceeds from the Offerings.[173]  As for Murray, Plaintiffs allege he is a partner of Softbank, which held 9,343,572 Fitbit shares and received $33.8 million in proceeds from the Offerings.[174]  Both directors share voting and dispositive power over the Fitbit stock owned by their respective funds.[175]  Plaintiffs' particularized allegations are sufficient at the pleading stage to allow a reasonable inference that Callaghan and Murray personally and materially profited from the challenged stock sales through their ownership and control of their affiliated funds.[176]

Having determined that Plaintiffs have pled particularized facts supporting a reasonable inference that four of the seven Demand Board members sold stock during the Offerings, I turn next to the sufficiency of Plaintiffs' allegations that these four Board members acted with scienter.[177]  The Selling Defendants argue that

---

[173] Rohrer Aff., Ex. 9 at 116 n.10.

[174] *Id.* at 116 n.11.

[175] *Id.* at 116 n.10, n.11.

[176] I note that information regarding whether Callaghan and Murray personally profited from the trades in question would not likely be found in a Section 220 books and records production.  In this regard, I am reminded of Justice Hartnett's admonition in his concurring opinion in *Brehm v. Eisner*: "Plaintiffs must not be held to a too-high standard of pleading because they face an almost impossible burden when they must plead facts with particularity and the facts are not public knowledge."  *Brehm*, 746 A.2d at 268 (Hartnett, J., concurring).

[177] Although this section explicitly addresses the inference of scienter as to Park, Friedman, Callaghan and Murray for purposes of assessing demand futility, the analysis applies equally to the question of whether Plaintiffs have well-pled that Zerella, as CFO, acted

Plaintiffs have failed to point to any evidence that a majority of the Selling Defendants received the material, nonpublic information that is at the heart of Plaintiffs' *Brophy* claim. Indeed, the evidence mentioned in the SAC expressly identifies only Park and Friedman as having received the internal documents that recount the problems Fitbit was experiencing with the PurePulse™ technology. Plaintiffs counter that they are not required to uncover and plead the "smoking scienter gun" in order to state a *Brophy* claim. Rather, at this stage, it is enough that they plead a series of particularized facts that would support a reasonable inference of knowledge, and resulting scienter, on the part of the insider traders. I agree and find they have done just that here.[178]

Plaintiffs have alleged that the products featuring the PurePulse™ technology accounted for 80% of Fitbit's revenue,[179] that Fitbit experienced serious problems

---

with scienter when trading in the Secondary Offering. As for Paisley, who was a member of the Demand Board but did not trade in the Offerings, the analysis is relevant to his state of knowledge as a member of the Board when the Court later considers whether he is disabled from impartially considering a demand that the Company prosecute Count I.

[178] *See Sanchez*, 124 A.3d at 1020 (holding that plaintiff is entitled to reasonable inferences when resisting a motion to dismiss under Rule 23.1).

[179] Defendants argue that the core operations doctrine has no place under Rule 23.1's heightened pleading standard (DRB 11-12). The cases Defendants cite, however, suggest the doctrine is not sufficient *on its own* in the context of generally pled allegations to establish scienter. *See, e.g.*, *Sandys v. Pincus*, 2016 WL 769999, at *17 (Del. Ch. Feb. 29, 2016), *rev'd on other grounds by Sandys v. Pincus*, 152 A.3d 124 (Del. 2016) (rejecting the core operations doctrine where plaintiffs' allegations were "pled generally" and noting that plaintiffs in *Pfeiffer v. Toll* had put forth additional allegations that outside directors sold substantial amounts of stock during the period in question); *In re Yahoo! Inc. S'holder*

with the technology early on, that Fitbit attempted to design fixes to the problems and those fixes were not working, that management was keeping the Board apprised of the problems and the efforts to address them, and that, all the while, Fitbit was touting the promise and success of PurePulse™ to the market.[180]  These well-pled facts, combined with the nature, timing and size of the Offerings, adequately support a reasonable inference that the Selling Defendants sought to make trades based on nonpublic information.[181]

Plaintiffs have also adequately pled that the Board designed the Secondary Offering to accommodate the Selling Defendants' interests.  Aside from initiating a rather unusual Secondary Offering after a successful IPO, the Board adjusted the terms of the offering at the eleventh hour to remove four million shares from what

*Deriv. Litig.*, 153 F. Supp. 3d 1107, 1123 n.10 (N.D. Cal. 2015) ("'[A] plaintiff must allege more than that directors should have known or must have known about matters relating to the corporation's 'core business'") (citing *In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 928 (N.D. Cal. 2010)); *In re Rocket Fuel Inc. Deriv. Litig.*, 2016 WL 4492582, at *6 (N.D. Cal. Aug. 26, 2016) ("It is hardly clear from the [complaint] that combatting ad fraud is the 'core' of Rocket Fuel's business . . . . Without more, the court cannot infer that the outside directors should or would have had detailed knowledge . . . ."). The totality of the facts Plaintiffs have pled with particularity allow a reasonable pleading stage inference that, because the problems with PurePulse™ were profound and PurePulse™ drove the Company's bottom line, both Fitbit management, including Zerella, and the Board knew of the alleged material, nonpublic information.

[180] SAC ¶¶ 105–23.

[181] *See Pfeiffer v. Toll*, 989 A.2d 683, 693 (Del. Ch. 2010), *abrogated on other grounds by Kahn*, 23 A.3d 831 (recognizing that allowing directors to claim ignorance of obvious information affecting the company would "afford ostrich-like immunity to directors").

Fitbit intended to sell, increasing the likelihood that the underwriters would exercise the Selling Defendants' overallotment option.[182]  In addition to this adjustment, the Board, without apparent explanation, waived the lock-up agreements for designated insiders.  With these waivers in hand, the Selling Defendants were able to execute their Secondary Offering trades at $28.13 per share.  Had the lock-up agreements not been waived, the Selling Defendants would have realized only $12.50 per share on the earliest day they would have been allowed to trade.

Defendants' exposure in the federal Securities Action is also a relevant factor in the *Rales* analysis.  As noted, all Defendants were also named as defendants in the Securities Action.  This court addressed a similar situation in *Pfeiffer v. Toll*, where individual defendants in a Delaware action alleging a *Brophy* claim were also named defendants in a companion federal securities action.[183]  In addressing the defendants' motion to dismiss, the court took notice of the federal court's holding that "the complaint sufficiently alleged that the defendants 'made material misrepresentations and omissions of material fact,' [and] that the insider trading of the individual defendants . . . raised a 'powerful and cogent inference of scienter,'

---

[182] SAC ¶¶ 82–84.  *Cf. Silverberg*, 2013 WL 6859282, at *14 (considering circumstantial evidence, such as timing and scope, to find defendants acted with scienter).

[183] *Pfeiffer*, 989 A.2d at 690.

and was 'unusual in scope and timing.'"[184] Given the board members' exposure in the federal companion litigation, Vice Chancellor Laster concluded that the plaintiff had pled a reason to doubt whether the derivative defendants could consider a demand impartially.[185]

In the Securities Action, Park, Friedman and Zerella were alleged to have violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 and all Defendants were alleged to have violated Sections 11 and 15 of the Securities Act of 1933 for issuing materially false or misleading statements related to the IPO.[186] The plaintiffs in the Securities Action *twice* survived a motion to dismiss under the rigorous standards for pleading securities fraud.[187] Judge Illston found that the plaintiffs' allegations were "sufficient to establish scienter" as to Park, Friedman and Zerella regarding their knowledge of PurePulse™'s inaccuracy.[188] In denying the motion to dismiss, the court also determined that,

> Taken together, the allegations in this case are at least as cogent or compelling as a plausible alternative inference, namely that Fitbit executives were simply unaware of the high degree of inaccuracy in

---

[184] *Id.* (quoting *City of Hialeah Empls.' Ret. Sys. and Laborers Pension Trust Funds v. Toll Bros., Inc.*, 2008 WL 4058690, at *2, *5 (E.D. Pa. Aug.29, 2008)).

[185] *Pfeiffer*, 989 A.2d at 690.

[186] SAC ¶¶ 17–18.

[187] Pls.' Compendium Tab 2 at 3 (denying motion to dismiss); Pls.' Compendium Tab 1 at 3 (denying motion for partial reconsideration).

[188] Pls.' Compendium Tab 2 at 17–18.

PurePulse™ devices alleged. Particularly given the contributions these devices made to Fitbit's revenue stream in 2015 . . . the Court finds that a holistic review of the allegations suffices to establish scienter.[189]

I take judicial notice that another court reviewing similarly pled facts found that those facts supported an inference of knowledge not only for Park, Friedman and Zerella but also for all Defendants under a "holistic review" of the pleading. And although the Securities Action has since settled, the settlement was not approved until a year after Plaintiffs filed their original complaint. If the Company had elected to move forward with Plaintiffs' action against the Selling Defendants, then the Company's efforts almost certainly would have "undercut or even compromise[d] the defense" of all defendants in the Securities Action.[190]

Having considered the foregoing, I am satisfied that Plaintiffs have pled particularized facts that support a reasonable inference that Park, Friedman, Callaghan and Murray—four of seven demand Board directors—possessed material, nonpublic information and relied on that information when making trades in the Offerings. Accordingly, Plaintiffs have met their burden to plead that these directors

---

[189] *Id.* at 18.

[190] *Pfeiffer*, 989 A.2d at 690. For these same reasons, Paisley, who is also a defendant in the Securities Action, would be disabled from impartially considering a demand to prosecute the *Brophy* claims on behalf of the Company since positions the Company would take in prosecuting those claims would likely compromise his defenses in the Securities Action.

face a substantial likelihood of personal liability on the *Brophy* claims, and demand is excused as futile as to Count II.[191]

## D. Count I – The Breach of Fiduciary Duty Claim

Plaintiffs' breach of fiduciary duty claim as stated in Count I has two components: (i) that all Defendants permitted the Selling Defendants to trade in the Offerings based on insider information; and (ii) that the Director Defendants waived the lock-up agreements that would have otherwise prevented the Selling Defendants from making their trades.[192] Defendants point out that Plaintiffs abandoned any claim based on the theory that the directors failed to prevent insider trades.[193] Indeed, Plaintiffs' brief suggests that only the Director Defendants' actions to facilitate the Selling Defendants' trades are relevant.[194] Accordingly, I focus my demand futility analysis on the second component of Count I and find that Plaintiffs have waived the first component.[195]

---

[191] *Rales*, 634 A.2d at 936.

[192] SAC ¶ 201.

[193] DRB 24 (citing PAB 58–59 n.235).

[194] PAB 58–59 n.235 (focusing only on the Board's approval of the lock-up waivers and stating "Defendants' argument concerning the Board's 'inaction' and cases where directors failed to detect accounting regularities . . . is irrelevant. Plaintiffs here allege much more than inaction and instead assert affirmative steps the Board took to facilitate the Selling Defendants' trades upon inside information").

[195] *See Emerald P'rs LP v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

45

The parties agree that when a plaintiff challenges a decision of the board to take affirmative action, like waiving the lock-up agreements, demand futility must be assessed under the two-pronged test stated in *Aronson v. Lewis*.[196] Thus, Plaintiff is obliged to plead particularized facts creating a "reasonable doubt" that either "(1) [a majority of] the directors [is] disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[197]

A director is interested in the underlying transaction if he "appears 'on both sides of a transaction' or expects 'to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or the stockholders generally.'"[198] Plaintiffs have alleged with particularity that the Director Defendants voted to approve the waivers of the lock-up agreements. And, as of the date Plaintiffs filed their complaint, four of seven Director Defendants—Park, Friedman, Murray, and Callaghan—were beneficiaries of the waivers when they sold shares in the Secondary Offering for significant

---

[196] *See* DOB 48–49, PAB 56.

[197] *Aronson*, 473 A.2d at 814.

[198] *Chester Cty. Empls.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at \*6 (Del. Ch. Oct. 6, 2017) (quoting *Aronson*, 473 A.2d at 812).

personal profit.[199]   If these pled facts are proven, entire fairness would be the standard of review.[200]

The Defendants argue that the waiver provided no unique benefits to the Selling Defendants because it applied equally to "other employees, consultants, and early investors" who were also subject to the lock-up agreements.[201]  This argument misses the mark for the simple reason that Plaintiffs have well pled that, unlike other constituencies who may have benefited from the waiver, the Selling Defendants were armed with nonpublic information not available to others who might be considering whether to participate in the Offerings.

Defendants' argument that Plaintiffs have failed to well-plead that the trades were material to the Selling Defendants is also unpersuasive.[202]   While the percentages of stock that Park, Friedman, Callaghan and Murray sold may have been small in relation to their holdings, their profits were sizable to say the least.

---

[199] *Cf. In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 592–93 (Del. Ch. 2007) (noting that spring-loaded and bullet-dodging options (options timed to enable insiders to avoid losses from future harmful disclosures) "clearly involve[] a deception" and implicate a "duty of loyalty").

[200] *See Lee v. Pincus*, 2014 WL 6066108, at *12-13 (Del. Ch. Nov. 24, 2014) (holding that entire fairness standard of review would apply to plaintiff's claim that board members breached their fiduciary duty by agreeing to waive contractual restrictions that had prevented most pre-IPO investors from selling their stock for a designated period because the directors personally were beneficiaries of the waiver).

[201] DOB 50.

[202] *Id.*

Friedman and Murray are alleged to have made over $30 million from the Secondary Offering and Park is alleged to have made more than twice that much. As pled, the trades were material.[203]

Plaintiffs have adequately pled facts that raise a reasonable doubt as to whether the Demand Board was disinterested with respect to the waiver of the lock-up agreements for designated employees and consultants. Accordingly, they have well-pled demand futility under the first prong of *Aronson* as to Count I of the SAC.

Under Delaware law, each director facing liability as a result of an action by the board has a right to be considered individually "because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary by director."[204] Here, Plaintiffs allege that Paisley voted to waive the lock-up agreements but did not subsequently sell shares in the Secondary Offering. As such, he is situated differently from the remaining Director Defendants discussed above who personally benefited from their votes to waive the lock-up agreements.

Although not expressly separating Paisley in their opposition papers, Plaintiffs have made clear their position that he is disabled from impartially

---

[203] *See Chen v. Howard-Anderson*, 87 A.3d 648, 670 (Del. Ch. 2014) (noting that a director's interest was material when he received more than $840,500 in benefits not shared with other stockholders).

[204] *In re Emerging Commc'ns Inc. S'holders Litig.*, 2004 WL 1305745, at *38 (Del. Ch. June 4, 2004).

48

considering a demand with respect to Count I for two reasons. First, as previously noted, Paisley was a defendant in the Securities Action and faced the same likelihood of liability as the remaining Defendants in that action. An election to move forward with Plaintiffs' demand in this action would undercut the defense in the Securities Action for Paisley as well as for the other Director Defendants.

Moreover, Plaintiffs cast doubt as to whether Paisley exercised his business judgment when he voted to waive the lock-up agreements. In *In re Emerging Commc'ns*, then-Vice Chancellor Jacobs found that a board member who voted to approve a transaction—but did not directly benefit from it—nonetheless "'consciously and intentionally disregarded' his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair."[205] Because this director had a unique understanding of the company's intrinsic value, the court found that his vote of approval exposed him to liability for breach of his fiduciary duty of loyalty. Here, Plaintiffs have alleged that Paisley faces a similar likelihood of liability because he knowingly facilitated the Selling Defendants' insider trading when he voted to waive the lock-up agreements.[206] Thus, Plaintiffs have adequately pled that director Paisley is also

---

[205] *In re Emerging Commc'ns,* 2004 WL 1305745, at *40 (citing *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del. Ch. 2003)).

[206] *See also In re Tyson Foods*, 919 A.2d at 592–93 ("A director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding

disabled from considering a demand as to Count I under the second prong of *Aronson*.

## E. Plaintiffs State Reasonably Conceivable Claims

Under Court of Chancery Rule 12(b)(6), a complaint must be dismissed if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts pled in the complaint.[207] In considering a motion to dismiss, the Court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor.[208] The Court need not accept conclusory allegations that lack factual support, however, or "accept every strained interpretation of the allegations proposed by the plaintiff."[209] "In the context of a motion to dismiss for failure to state a claim, the pleading standard does not reach so high a bar as Rule 23.1."[210]

---

shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary.").

[207] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[208] *In re Gen. Motors*, 897 A.2d at 168.

[209] *Id.*

[210] *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007).

Thus, if a complaint survives a motion under Rule 23.1, it will likely survive a motion under Rule 12(b)(6).[211]

Beyond renewing the same arguments they raised to attack the sufficiency of Plaintiffs' *Brophy* and fiduciary duty claims in the context of their Rule 23.1 dismissal motion, Defendants' remaining argument in support of Rule 12(b)(6) dismissal is that Plaintiffs' claims are subject to exculpation under Section 102(b)(7) of the DGCL and the exculpatory provision in Fitbit's certificate of incorporation.[212] At this pleading stage, I cannot agree. The exculpatory provision does not, and cannot, provide director exculpation "for any transaction from which the director derived an improper personal benefit," implicating their duty of loyalty.[213] For reasons discussed above, Plaintiffs have stated a viable *Brophy* claim against the Selling Defendants and viable breach of the duty of loyalty claims against the Director Defendants relating to the waiver of the lock-ups. As pled, these claims are not subject to Section 102(b)(7) exculpation.

---

[211] *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008).

[212] DOB 53–54, 58–60 (citing 8 *Del. C.* § 102(b)(7)).

[213] 8 *Del. C.* §102(b)(7)(iv). *See also In re Emerging Commc'ns,* 2004 WL 1305745, at *40 (holding that a director who facilitated a breach of the duty of loyalty by a fellow director was not entitled to exculpation). I also note that although corporate officers and directors owe identical fiduciary duties, Section 102(b)(7) does not exculpate officers from monetary liability. *See Gantler v. Stephens*, 965 A.2d 695, 708, 709 n.37 (Del. 2009). Accordingly, Zerella is not entitled to exculpation as a matter of law.

51

## III. CONCLUSION

Based on the foregoing, I am satisfied Plaintiffs have adequately pled demand futility and stated viable claims under *Brophy* and for breach of the fiduciary duty of loyalty in connection with the Company's PurePulse™ technology, IPO, lock-up waivers and subsequent Secondary Offering. The Motion to Dismiss, therefore, must be **DENIED**.

**IT IS SO ORDERED.**